IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

OSCAR GARNER,

                            Plaintiff,                              ORDER

    v.                                                              11-cv-829-slc

PAUL SUMNICHT, BELINDA SCHRUBBE,
CYNTHIA THORPE and MARY GORSKE,

                            Defendants.

---

Plaintiff Oscar Garner claims in this lawsuit that the defendants violated the Eighth Amendment and state medical negligence law by failing to provide him with adequate medical treatment and a special diet for his lactose intolerance and irritable bowel syndrome.  Before the court are the parties' cross motions for summary judgment, dkts. 36 and 42, and Garner's motion for assistance in recruiting counsel, dkt. 61.  Garner apparently seeks counsel for trial because he filed his request on May 21, 2013, after filing his motion for summary judgment and after responding to defendants' motion.

Because the evidence does not support a finding that any of the defendants acted with deliberate indifference to Garner's medical needs, I am denying his motion for summary judgment and granting defendants' motion.  As a result, it is unnecessary to consider defendants' arguments related to qualified immunity.  I am declining to exercise supplemental jurisdiction over Garner's state law claims and will dismiss them without prejudice.  Finally, I am denying as moot Garner's motion for assistance in recruiting counsel for trial.

## Preliminary Procedural Concerns

At the outset, the court must address a few issues with the parties' proposed findings of fact.  First, defendants have proposed as a *single fact* a 15-page overview of Garner's medical treatment over the course of five years.  DPFOF #18, dkt. 44 at 5-19.  This is an egregious

violation of this court's requirement that "each fact must be proposed in a separate, numbered paragraph, limited as nearly as possible to a single factual proposition." *See* Procedures to be Followed on Motions for Summary Judgment I.B.1, attached to Pretrial Conf. Ord., dkt. 22. If the shoe were on the other foot, the defendants would be apoplectic, insisting that the court deny the entire motion on this basis alone. That's a bit extreme, but I am disregarding proposed finding of fact #18 because it violates this court's procedures and has thwarted Garner's efforts to respond as required by the court's procedure.[1]  I am also disregarding defendants' proposed finding of fact #21 for similar reasons: although only one paragraph long, #21 summarizes four years of plaintiff's medical history.

Next, Garner attempts to dispute several of defendants' proposed findings of fact by citing to "Aff. of Oscar Garner" followed by a number. Garner has submitted two affidavits in support of his summary judgment filings, dkts. 39 and 57. In most instances, it is unclear which affidavit he is referring to, or whether the number he provides is meant to identify a paragraph or page; some entries refer to a number that does not correspond to any existing page or paragraph. The court has warned the parties that "[i]f a party's response to any proposed fact does not comply with the court's procedures or cites evidence that is not admissible, the court will take the opposing party's factual statement as true and undisputed." Memorandum to Pro Se Litigants Regarding Summary Judgment Motions at 3, attached to dkt. 22. Section II.E. of the procedure requires that a party must support a claimed dispute of a proposed fact with admissible evidence, which may include an affidavit. When a party cites to an affidavit, §

---

[1] Although #18 is broken into paragraphs that march by date through Garner's visits to health services, the immense amount of information involved makes it impossible for Garner to respond thoroughly and precisely. Garner gamely cites generally to his own proposed findings of fact in which he describes many of the same health services visits in separately numbered paragraphs; a review of defendants' response to Garner's proposed facts shows that the parties dispute what was discussed during some of these visits.

I.C.1.e. requires citation to the page and paragraph number and the date of the affidavit. "The court will not search the record for evidence." § I.C.1. Therefore, where Garner has cited either a non-existent or unrelated portion of his affidavit in response to a fact proposed by defendants, the court will accept defendants' factual statement as true and undisputed.

Finally, defendants respond to many of Garner's proposed findings of fact with the general phrase "Not supported by cited admissible evidence." In some instances, it is not clear what they find objectionable.[2] As a result, I will accept as undisputed any proposed factual finding that defendants failed to object to properly.

Against this backdrop, for the purpose of deciding the motions for summary judgment, I find from the parties' submissions that the facts set out below are material and undisputed:

## FACTS

### I. The Parties

Plaintiff, inmate Oscar Garner has been incarcerated at Waupun Correctional Institution (WCI) since February 2, 2008. During his incarceration, Garner was diagnosed with lactose intolerance. He also exhibited symptoms similar to irritable bowel syndrome (IBS).

Defendant Paul Sumnicht was employed by the Wisconsin Department of Corrections (DOC) as a physician at WCI from April 1, 2007 to October 7, 2012, during the events in question in this case. He now is a physician at another correctional institution. Under the general supervision of the Bureau of Health Services (BHS) Medical Director, Dr. Sumnicht is responsible for providing professional medical services to inmates in accordance with the standards of practice in Corrections and Community Standards and BHS Policies, Procedures

---

[2] Many of the proposed facts in question cite to Garner's complaint, which defendants previously challenged as an inadequate substitute for an affidavit. However, I already rejected that challenge in an order entered on August 14, 2012, finding that Garner properly verified his complaint.

3

and Standards.  Dr. Sumnicht attends to the medical needs of inmates, diagnoses and treats illness and injuries, and arranges for professional consultation when warranted.  He also assists in the supervision of the development and implementation of treatment protocols.

Defendant Mary Gorske was employed by DOC as a Nurse Practitioner at WCI from April 28, 2002 to April 24, 2010.  Gorske's duties included independently managing the healthcare of incarcerated individuals in collaboration with the Medical Director and with all medical disciplines practicing in the Health Services Unit (HSU).  These duties included diagnosing, planning, directing, and evaluating patient care, and developing education programs used by health care staff to meet the needs of incarcerated individuals.  Gorske did not have the authority to override or alter orders issued by other health care professionals, to write prescriptions or to refer inmates to outside specialists.  Although Gorske provided treatment to Garner at WCI, she consistently referred him to Dr. Sumnicht and deferred to Dr. Sumnicht's medical decisions on the best course of treatment for Garner.

Defendant Belinda Schrubbe has been employed by DOC as the HSU Manager at WCI since December 2001.  Schrubbe is responsible for generally overseeing the delivery of all medical services and providing administrative support to physicians and other HSU staff at WCI.  Because of her supervisory responsibilities, Schrubbe does not usually participate in or provide direct patient care.  She never personally treated Garner and had no personal involvement in the decisions made regarding his medical treatment.  Schrubbe had no authority to override or alter orders issued by other health care professionals, she could not write prescriptions and she could not refer inmates to outside specialists.

Defendant Cynthia Thorpe is a licensed registered nurse who was employed by DOC as Health Services Nursing Coordinator from February 25, 2001 until May 31, 2011.  In that capacity, Thorpe was responsible for the coordination and oversight of health services provided

at adult and juvenile facilities in the DOC with an emphasis on adult institutions. Her specific responsibilities included policy development, consulting with institution and other management staff regarding professional practice issues, and participating in clinical, administrative and program issues relating to the delivery of health care in the DOC. Thorpe did not supervise the day-to-day operations of individual DOC correctional institutions and she did not have direct supervisory control over any institution employees.

Because of her supervisory responsibilities, Thorpe did not usually participate in or provide direct patient care. Treatment decisions were made by the health services staff within each institution. Thorpe never treated Garner or had any other involvement in the decisions made about his care. She also did not have the authority to override any of the orders made by health care professionals.

At times, Thorpe served as a reviewing authority on offender complaints filed by inmates within the Inmate Complaint Review System (ICRS). In this capacity, Thorpe received recommendations of the institution complaint examiners who had taken action on inmate complaints. Under Wis. Admin. Code § DOC 310.12, a reviewing authority is authorized to review and decide an inmate complaint.

## II. Garner's Treatment

Before arriving at WCI, Garner was on prescription medication for lactose intolerance. On February 25, 2008, shortly after Garner arrived at WCI, Gorske examined him and ordered that Garner be provided daily with a high calorie, high protein snack bag containing a sandwich, fresh fruit, milk and a cookie or crackers.[3] At that time, Garner was 5'10" tall and weighed 138

---

[3] The parties dispute whether Garner was placed on a high protein/high calorie *diet* and whether Gorske continued Garner's prescription for lactose pills.

pounds, which calculated to a body mass index (BMI) of 19.8.  According to the BMI calculator used by the Centers for Disease Control, this was a normal weight range.  According to the CDC, a BMI ≤ 18 is the threshold of malnourishment (or "underweight status).  This would be a weight ≤ 125 pounds for a 5'10" person.

Over the next five years, Garner regularly visited the health services unit with complaints about abdominal issues, including cramps, gas, constipation, diarrhea and blood in his stool:

- March 11, 2008:  Garner saw Nurse Giese and discussed the time of day that he took his Lactaid pills.[4]

- May 21, 2008: Dr. Sumnicht gave Garner Tums.

- July 21, 2008: Dr. Sumnicht stated that he was taking Garner off Lactaid to see how it would work for him to self-select foods.  The same day, Garner submitted a health services request (HSR), asking for a "no dairy diet" with sufficient calories.

- July 22, 2008:  HSU responded that "the Doctor wants [you] to self-select from [your] tray.  [He] needs to see how you do for a few weeks."

- July 23, 2008:  Garner complained that his snack bag contained cheese and milk.  Gorske told Garner that he should eat the cheese because it is very low in lactose and avoid the milk.

- August 7, 2008:  Garner's Vitamin D level was less than 7.0 L; normal range was between 32 and 100.

- September 26, 2008:  Garner spoke with a nurse about not being able to eat and drink any foods being served to him and asked to be placed back on the lactose pills.  She stated that he needed to talk to the doctor.

---

[4]  The parties dispute whether Garner complained about gastrointestinal problems to Nurse Giese on February 26 and March 11, 2008.

- October 7, 2008:  Garner told Dr. Sumnicht that he tried to avoid foods containing lactose but that he was still having cramps, gas and diarrhea.  Dr. Sumnicht stated that he wanted Garner to continue to self-select foods and eat the snack bag and that he would test Garner's Vitamin D level in 30 days.

- October 11, 2008:  Garner's Vitamin D level was 22.6.

- January 5, 2009: Dr. Sumnicht saw Garner for low Vitamin D level and ordered treatment with a multivitamin (MVI) or mackerel on canteen.  Dr. Sumnicht told Garner that his Vitamin D level was low because he was not getting enough dairy.[5]

- May 20, 2009:  Complained to Nurse Gail about stomach cramps, blood in stool and feeling full of stool.

- May 21, 2009:  Garner saw Gorske about complaints of diarrhea and abdominal pain with blood in stools.  A rectal examination was done and some blood seen.[6]

- June 9, 2009:  Follow-up with Sumnicht about stool and hemorrhoids.

- June 25, 2009:  Seen by nurse for "boiling" stomach, diarrhea and feeling that food was just sitting in stomach.

- June 30, 2009:  Gorske prescribed Omeprazole, which slowed Garner's problems.

- August 24, 2009:  Garner saw Gorske for stomach pain, diarrhea and having to use the bathroom frequently.  She gave him Metamucil caps to firm up his bowel movements.

- September 14, 2009:  Gorske told Garner told that there was no need for a special diet, he could eat foods low in lactose, he could adjust serving sizes to eat less of foods that may bother him and lactose intolerance is not a medical problem and doesn't need to be treated with medications or special diet.

---

[5] Although defendants deny this and allege that there are many reasons for a low Vitamin D level, the affidavit and medical records that they cite as support do not mention the cause of a low Vitamin D level or whether Dr. Sumnicht discussed that issue with Garner.

[6] Although Garner claims that he had internal hemorrhoids because he had diarrhea, he has not medical evidence or expert opinion to support his allegation.  Dr. Sumnicht avers that diarrhea could exacerbate internal hemorrhoids, which could be caused by change in diet in some cases.

- September 25, 2009:  Garner wrote HSU about getting a snack bag refill.  On September 28, 2009, Schrubbe responded that they no longer wrote orders for snack bags, which instead were given to inmates with bedtime medications.

- September 30, 2009:  Garner wrote another request about snack bag and received a response stating "discontinued. Selfselect."  He was placed on meal monitoring for one week while he was in segregation to see how much food he was eating after self-selecting.  He was weighed to access his weight gain or loss.

- November 24, 2009:  Nurse Ann Fabb wrote Garner that his Vitamin D dose did not require testing at that time and that Dr. Sumnicht did not want to "order lactose."

- January 11, 2010:  Garner wrote to the kitchen complaining that his snack bag contained dairy products and hard bread.  Told request for change denied and that he may self-select from his snack bag.

- January 12, 2010:  Garner wrote HSU about having problems with dairy and explaining that the kitchen told him to self-select from the snack bag.  On January 13, 2010, Nurse Gail indicated that the kitchen was correct, and Nurse Francis told him to discuss the matter with the kitchen because HSU does not intervene.

- January 25, 2010: Garner complained to Gorske about diarrhea and another nurse's refusal to refill his Loperamide, which had helped prevent his diarrhea.  Gorske ordered lab tests.[7]

- January 28, 2010:  Saw Nurse Tabb for diarrhea and bloody stool.

- February 22, 2010: Dr. Sumnicht saw Garner for bloody stool and Sumnicht prescribed medication.

- March 22, 2010:  Wrote to Schrubbe about not receiving adequate diet from Food Services and asked for permission to purchase food from the canteen.  Garner claims that Schrubbe denied his request because he was in segregation.

---

[7] Garner avers that Gorske told him that he "probably" was suffering from irritable bowel syndrome and that the tests could not confirm it.  Gorske avers that she said "possibly" and ordered a consult with Dr. Sumnicht.

8

- March 25, 2010:  Wrote to Dr. Sumnicht asking for permission to purchase certain food items such as mackerel and or MVI from the canteen to supplement his inadequate diet.  Dr. Sumnicht responded that "these items are on canteen" and noted it in a progress note.

- May 27, 2010:  Wrote Schrubbe about incomplete and missing snack bag and requested diet tray instead.  Nurse Tabb responded on June 10, 2010 that he write to Food Service Administrator Robert Tuckwell or file a complaint.

- May 31, 2010:  Garner submitted HSR requesting that snack bag be extended because he had not been receiving it.  On June 10, 2010, Dr. Sumnicht responded that "your weight is ok, no medical need for snack bag."

- June 1, 2010:  Garner wrote Tuckwell who responded on June 3 that "your snack order stopped on 6-1-2010.  [O]nly H.S.U. can request to renew this diet order."

- June 30, 2010:  Schrubbe wrote Garner that "Your diet order was written for high protein, high calories diet using HS snack bag method.  Also at this time the diet will not be written.  HSU will follow with you to determine your medical need for additional food.  Currently your weight did not change with the added food."

- July 10, 2010:  Wrote Schrubbe asking when he would see Dr. Sumnicht and why was he was taken off his snack bag for 30 days.  Garner claimed that his weight was currently 135 pounds, whereas in May 2010 it was 141 pounds.[8]

- July 16, 2010:  Wrote Dr. Sumnicht asking why he was taken off his snack bag for 30 days when he had lost 6 pounds.  Garner claimed that he went from 141 to 135 pounds.[9]  The next day, Dr. Sumnicht responded that "I want to see what happens to (your) weight."

- July 16, 2010:  Wrote to Schrubbe that "they keep checking my weight only, and not giving me the right medications to relieve my pain and suffering. And not checking for any other possible cause of the stomach cramps, diarrhea and weight loss."  The next day, Schrubbe responded that "you should be having labs and X-Rays."

- August 16, 2010:  Garner given x-ray that showed increased fecal material in the colon with no evidence of obstruction.

---

[8] Defendants dispute that these are correct representations of Garner's weight.

[9] Defendants dispute this.

- September 2, 2010:  Garner's Vitamin D level was 35 after supplements were supplied.

- September 27, 2010:  Examined by Nurse Lyons, given Senna and provided with IBS education materials.

- October 12, 2010: Garner submitted HSR indicating he had been diagnosed with irritable bowel syndrome and lactose intolerance and has diarrhea and severe pain every time he eats food that contains small or low doses of dairy.  He asked whether it was possible that he could not tolerate any dairy products.  HSU responded on October 15, 2010 that he needed to self-test by not eating any milk products to see if helped because there is no test for lactose intolerance.

- February 15, 2011:  Garner submitted HSR to Schrubbe indicating that although he was on lactose pills that had to be taken before eating dairy products, the medications were not passed out until after meals were done.  He requested a special diet with no dairy products.  She responded on February 16 that according to the pharmacy, he could take the pills prior to eating dairy, with his first bite of dairy or as a soon as possible after eating dairy.

- February 23, 2011:  Schrubbe wrote Garner that "According to (your) medical chart, (you) do not have irritable bowel syndrome.  (You) do have lactose intolerance, which you have had for a long time.  There is no WCI/BHS/DOC protocol on irritable bowel syndrome.  There is no reason to treat you for irritable bowel syndrome.  Please continue to work with your provider."

- March 15, 2011:  Garner was seen by Nurse Tabb for severe stomach pain, constipation and diarrhea and complained about not being able to eat even 50% of his food after avoiding dairy.

- March 22, 2011:  Garner asked Schrubbe why he was being treated for IBS with Senna if he did not have it and wondered if a mistake had been made.  Schrubbe responded in part on April 1 that the diagnosis is made by ruling out everything else and that he does have a diagnosis of lactose intolerance.

- April 13, 2011:  Garner wrote Schrubbe that he had received a memo from Tuckwell stating that the kitchen is again putting milk in many dishes.  He asked how he could eat off the main food tray and sustain an adequate calorie intake.

- October 10, 2011:  Saw nurse practitioner who indicated that he had medications for both constipation and diarrhea.

10

- December 4, 2011: Garner asked HSU why he couldn't get a diet tray.  Nurse Amy stated that it was DOC policy to self-select to avoid dairy products.

- February 14, 2012:  Garner wrote to Schrubbe asking for a single cell because having long periods of diarrhea that has strong smells causes him to get into it with his cellmate and puts him in danger.  Schrubbe responded that the above was not a medical reason for a single cell at WCI.

- April 17, 2012:  Garner wrote to the kitchen about not receiving a non-dairy diet tray.  He received a response denying his request on the ground there was no non-dairy diet and an inmate had to self-select.

- April 25, 2012:  Garner submitted an HSR requesting a non-dairy diet.  An appointment was made for him to see medical staff.

- May 18, 2012:  Garner told Nurse Lyons that he wanted a snack bag because he was still hungry after self-selecting from his food tray.  She stated that he didn't fit the criteria.

- May 25, 2012:  Garner wrote HSU for information on how DOC determines the criteria for a snack bag and special diet.  Nurse Larson responded that the nurse practitioner addressed this on May 18, indicating that his body mass index was in the normal range.  She also told him to use the canteen because he does not meet the medical criteria.

- August 27, 2012:  Nurse Lyons gave Garner a high protein/high calorie diet because he was not getting enough calories.

- September 11, 2012:  Without seeing Garner, Sumnicht discontinued Garner's Loperamide stating that it was not medically necessary.

- October 24, 2012:  Wrote to HSU about seeing nurse that day for diarrhea and stomach pain.  Told to write HSU because needs medications.  Nurse Judy responded the next day by writing "Loperamide and Tylenol;" "gave this to prescriber to reorder."

- October 27, 2012:  Saw Nurse C.M. about stomach pain, cramps, diarrhea and constipation. He explained that his Loperamide was discontinued without seeing Sumnicht.  Nurse told him to set aside time to go to bathroom and avoid foods that upset his stomach.

- November 2, 2012:  HSU sent Garner a memo indicating that the nurse wanted to see him the following week about his "chronic diarrhea without meds."

- December 15, 2012:  Garner wrote to Schrubbe asking to see a specialist for IBS because HSU will not test him to rule it out.  Schrubbe responded that only his provider can refer him to a specialist and that has not been deemed medically necessary.

- December 25, 2012: Garner wrote Schrubbe about how he could buy the recommended Pink Bismuth given he was in segregation.  Garner did not receive an answer to his question.[10]

- January 10, 2013:  Garner weighed 144 pounds.

- March 10, 2013: Garner filed refill request for Reguloid for diarrhea.  Received slip stating that it could not be refilled.

- March 16, 2013:  Garner asked Schrubbe and Nurse Lyons for anticholinergic medication to help control his muscle spasms and asked to be fed in his cell so he would have more time to eat.  He received a response stating that he was scheduled to see a nurse.[11]

- March 19, 2013:  Garner saw Nurse Lyons about IBS, constipation and diarrhea. He weighed 156 pounds.  At this time, he had been able to eat food from off the canteen because he had some extra money.

- March 23, 2013:  Asked Schrubbe why he was taken off Miralax.  Nurse Amy wrote him that his provider has discontinued it.

- April 7, 2013:  Nurse Larson notified Garner that he would not be given Loperamide or Reguloid for diarrhea.

According to Dr. Sumnicht, lactose intolerance affects a huge number of the world's population; it is not considered a disease; and having it does not mean that Garner cannot tolerate *any* dairy products.  In Dr. Sumnicht's opinion, unless a patient has a significant disease process complicating lactose intolerance and has a clear and significant nutritional risk, lactose

---

[10] Although defendants point to an HSU response that states "Forwarded to HSUM," they do not refute Garner's claim that his question about buying bismuth was not answered.

[11] Although Garner claims he never saw a nurse, defendants point to records indicating that he refused to be seen.

intolerance should be managed by the patient through dietary selection.  Gorske also shares the opinion that Garner did not have a medical need for a dairy-free diet and that he could avoid symptoms by self-selecting foods.  HSU staff provided Garner with information on how to do this and consistently encouraged him to eat what didn't bother him or make him feel sick.[12]

Although WCI did not have a special non-dairy diet, the current modified diet order form for the institution includes an "other" category which states "including other allergy (consult with central office dietitian prior to ordering other diets)."

Dr. Sumnicht theorizes that Garner's food choices, as evidenced by his canteen orders between April 10, 2008 and March 28, 2013, likely contributed to his abdominal distress. When he was not barred from making canteen purchases in segregation, Garner repeatedly purchased these comestibles:

nacho cheese tortilla chips
coffee
colas
jalapeno and cheddar chips
hot porkies
hot & spicy ramen noodles
hot sauce
nacho cheese dip
oatmeal crème pies
star crunch chocolates
Big Red cinnamon gum
cheddar cheese popcorn
chocolate chip cookies
caramel corn
Atomic Fireballs candy
honey buns
onion dip

beef salami
pepperoni
hot chili
hot chili with beans
pizza sauce
donut sticks
cheddar & sour cream potato chips
habañero cheese spread
corn nuts
BBQ sauce
refried beans & rice hot chili
Cherry Pepsi
Orange Crush
fudge dipped granola bars
fudge rounds
strawberry crème cookies

fish steaks in hot sauce
Velveeta spicy cheesy rice
BBQ corn chips
Twix candy bars
Payday candy bars
Nutrageous candy bars
garlic kosher pickles
chocolate chip granola bars
Cajun shrimp
salami jack links
hot peanuts
Mountain Dew
chocolate chip crème pies
chocolate covered peanuts
wintergreen Certs
chili ramen noodles
refried beans.

---

[12] Although Garner had food menus available to review and consulted with Food Service regarding food choices, he avers that he was not given the list of ingredients that the food contained, making it difficult to determine whether a particular food contained dairy.

Inmates housed in levels 1 and 2 in segregation are not allowed to purchase food from the canteen until they have shown positive behavior and have been promoted up a level system. Canteen items are available at level 3 in segregation and in the North Cell Hall overflow.

Dr. Sumnicht believes that the dangers presented by diarrhea are dehydration or malnourishment. Medical staff as WCI closely followed and regularly measured Garner's weight. Garner was encouraged to push fluids regularly. Dr. Sumnicht investigated the causes of Garner's diarrhea with lab tests, which were all negative for various infections. Based on Garner's symptoms and presentation, Dr. Sumnicht did not believe that the cause of Garner's diarrhea was some more serious condition, such as Crohn's disease or ulcerative colitis.

Garner received the following written information from HSU about IBS:

> [A]bout 1 in 6 people in the U.S. have symptoms of IBS. It is the most common intestinal problem that causes patients to be referred to a bowel specialist (gastroenterologist). Symptoms range from mild to severe. Most people have mild symptoms. Symptoms are different from person to person, for some people, the symptoms may get worse for a few weeks or a month, and then decrease for a while, for other people, symptoms are present most of the time some patients will have colonoscopy. During this test a flexible tube is inserted through the anus to examine the colon. You may need this test if: You have symptoms such as weight loss or bloody stools. Irritable bowel syndrome may be a lifelong condition. For some people, symptoms are disabling and reduce the ability to work, travel, and attend social events. Symptoms can often be improved or relieved through treatment.

## III.  Garner's Complaints

Garner filed these inmate complaints about his lack of treatment:

- March 17, 2009:  Inmate complaint that Dr. Sumnicht not testing his Vitamin D level and Schrubbe failed to respond to request for test. Complaint subsequently rejected and dismissed.

- September 9, 2009:  Complaint WCI-2009-20584 about not getting a lactose diet or lactose enzyme.  Subsequently rejected and upheld on review.

- September 14, 2009: Complaint WCI-2009-21149 about not being given special diet for lactose intolerance.  Complaint was dismissed.

- September 28, 2009:  In response to Complaint WCI-2009-22836, Warden Michael Thurmer stated that he "have also checked with HSU and been advised that (you) are not on a lactose intolerance diet.  (You) have been advised to possibly be aware of any food that is obviously high in lactose content."

- February 22, 2010:  Complaint WCI-2010-3278 about having bloody stool that doctor was not addressing.

- February 26, 2010:  Thorpe wrote letter to Garner and told him that medical staff was monitoring him regularly and did not feel that he needed treatment for lactose intolerance.

- March 6, 2010: Complaint WCI-2010-5278 about Dr. Sumnicht's failure to address his bloody stool on February 22, 2010.  Garner stated that medication did not work.  Complaint dismissed because condition not ignored—hemoccult tests and past stool cultures were negative and Garner was prescribed acidophilus and cholestyramine.

- March 9, 2010:  Complaint WCI-2010-5462 regarding not being provided any medical treatment or pills for lactose intolerance. Also wrote letter to Schrubbe to request medical treatment for lactose intolerance because suffering from severe stomach pain and diarrhea.  Told that "We do not give special lactose free diets, contact food service regarding managing your diet. Will schedule for sick call."[13]

- March 14, 2011:  Complaint WCI-2011-5256 regarding Schrubbe's February 22, 2011 claim that he did not have IBS.

---

[13] Parties dispute whether Schrubbe or Tabb made this statement.  (The written response was not signed.)

- April 2, 2010:  Complaint WCI-2010-7221 about not being allowed to purchase items from the canteen to meet his dietary needs.  Complaint was denied in part because "HSM (Schrubbe) has reviewed the claims in the complaint and states in response, (I've) reviewed medical chart.  (I) did not see a written physician order referring to the items in concern."

- May 10, 2012:  Complaint WCI-2012-9827 that medical staff did not respond to his HSR about not receiving an adequate diet or schedule an examination.  The complaint was rejected.

- November 5, 2012:  Complaint about diarrhea medications not being prescribed.  ICE dismissed complaint on December 11, 2012, writing that Schrubbe reported "MD discontinued patient orders for Loperamide and APAP on 9-11-12 stating 'no medical indication' and patient was notified.  Patient was seen by NP on 10-2-12 and did not renew discontinued medication."

- November 5, 2012:  Garner filed complaint about being told by Nurse Larson that he does not have IBS.  The ICE dismissed the complaint on December 11, 2012, writing that Schrubbe reported that "It is difficult for nursing staff to determine if patient has IBS.  NP has documented that IBS is subjective.  Nursing staff do not render medical diagnoses, only advance providers do this.  It is the responsibility of adv. Providers to determine what medical treatment is needed, if any for diagnosed conditions.   Patient is being seen and his medical needs are being addressed by advance providers."

- November 16, 2012:  Garner filed complaint about not agreeing with diagnosis regarding lactose intolerance.  ICE dismissed complaint on December 11, 2012, indicating Schrubbe reported "On 8-27-12, NP documented 'IBS-subjective symptoms', which indicates no objective, medical findings to support or not support IBS.  HSM does not diagnose patients, she merely gathers information from medical chart. On 10-2-12, NP again wrote diagnosis of IBS - self care."  The ICE noted that "Garner must realize that 'subjective symptoms' and 'self-care' speak to what he must do related to his claims. This is not a conclusive indication he has IBS with IBS or lactose intolerance symptoms, what the patient does to care for themselves directly impacts their health regardless of a conclusive diagnosis."

From April 28, 2009 through May 10, 2011, Thorpe acted as a reviewing authority on a number of inmate complaints submitted by Garner via the ICRS.  In that capacity, Thorpe evaluated the findings of the ICE and made her determination accordingly.

OPINION

## I.  Summary Judgment Standard

Summary judgment is proper where there is no showing of a genuine issue of material fact in the pleadings, depositions, answers to interrogatories, admissions and affidavits, and where the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "'A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party.'"  *Sides v. City of Champaign*, 496 F.3d 820, 826 (7th Cir. 2007) (quoting *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005)).  In determining whether a genuine issue of material facts exists, the court must construe all facts in favor of the nonmoving party.  *Squibb v. Memorial Medical Center*, 497 F.3d 775, 780 (7th Cir. 2007).  Even so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, he must come forward with enough evidence on each of the elements of his claim to show that a reasonable jury could find in his favor.  *Borello v. Allison*, 446 F.3d 742, 748 (7th Cir. 2006); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).

## II. Eighth Amendment

Garner alleges that because defendants have refused to place him on a lactose-free diet or treat him with lactose pills, he has suffered severe abdominal pain, diarrhea, Vitamin D

17

deficiency and significant weight loss over a three-year period.  He also alleges that defendants did not take proper steps to diagnose or treat his IBS.  To survive defendants' motion for summary judgment, Garner must present evidence supporting the conclusion that he had an "objectively serious medical need" and that defendants were aware of his serious medical need and were "deliberately indifferent" to it.  *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) (citing *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976)).  Defendants do not challenge Garner's claim that his lactose intolerance and irritable bowel syndrome constitute serious medical needs, but they contend that Garner has not established–*cannot* establish–that they acted with deliberate indifference to those needs.

Deliberate indifference is proven by demonstrating that a prison official knows of a substantial risk of harm to an inmate and "either acts or fails to act in disregard of that risk." *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012) (citing *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011)).  When the defendant is a medical professional who has provided some treatment to the plaintiff, the question is whether that treatment was constitutionally adequate. *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008).  To prove that it was not, a plaintiff must show that the treatment was "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Arnett*, 658 F.3d at 751 (quoting *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008)).  Allegations of medical malpractice or negligence — even "gross negligence"— are insufficient to meet the deliberate indifference standard.  *Farmer*, 511 U.S. at 836.  Likewise, mere disagreement with a doctor's medical judgment is not enough to prove deliberate indifference in violation of the Eighth Amendment.  *Berry v. Peterman,* 604 F.3d 435, 441 (7th Cir. 2010) (citing *Estelle*, 429 U.S. at 106 )(citation omitted)); *Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003).

### A. Defendant Sumnicht

Although the full scope of Garner's medical treatment is not before the court because of the parties' mistakes in proposing their factual findings, it is clear that Garner had regular (almost monthly) contact with the medical staff at WCI.  His main complaint is that Sumnicht took him off Lactaid pills and other medications and refused to order him a special lactose-free diet, forcing him to self-select foods from a regular meal tray.  Garner alleges that this course of treatment resulted in him having a Vitamin D deficiency and unsafe weight loss because he could not get an adequate amount of calories from the regular meal tray.[14]  He also alleges that he had severe gastrointestinal problems (that also caused internal hemorrhoids) because it was impossible to self-select out all of the dairy in his food—either because he could not identify it or because he needed to eat something so as to not go hungry.  In addition to causing him pain, Garner alleges that his symptoms also created significant tension with his cellmate, with whom he shares a small cell for 18 to 22 hours a day, and caused other inmates to think he has AIDS.

Garner cites several cases in which the Supreme Court, the Court of Appeals for the Seventh Circuit and this court have recognized that denying inmates sufficient food for extended periods of time may violate the Eighth Amendment.  *See Hutto v. Finney*, 437 U.S. 678, 683, 686-87 (1978) (diet consisting of fewer than 1,000 calories each day could violate Eighth Amendment if maintained for substantial time period); *Atkins v. City of Chicago*, 631 F.3d 823, 830 (7th Cir. 2011) ("Depriving a person of food for four days would impose a constitutionally significant hardship"); *Sanville v. McCaughtry*, 266 F.3d 724, 734 (7th Cir. 2001) ("withholding food from an inmate can, in some circumstances, satisfy the first *Farmer* prong"); *Powell v. Kingston*, 2005 WL 752233 (W.D. Wis. Mar. 29, 2005) (allowing inmate to proceed on claim

---

[14] Although Garner could purchase non-dairy foods from the canteen when he was house in general population, he could not do so in segregation, where he apparently spent a fair amount of time.

that defendants subjected him to diet of fewer than 2,000 calories a day for 46 and 31-day periods). All of those cases involve claims brought under the Eighth Amendment by an inmate who alleged that he was deprived humane conditions of confinement or basic necessities of life because he was denied adequate nutrition. Garner's claim is somewhat different in that he is alleging constitutionally inadequate medical care. Even so, the question to be answered is generally the same: were the defendants deliberately indifferent to a substantial risk of serious harm to Garner's health or safety? *See Freeman v. Berge*, No. 03-cv-21-bbc, 2003 WL 23272395, at *5 (W.D. Wis. Dec. 17, 2003) (citing *Reed v. McBride*, 178 F.3d 849, 853 (7th Cir. 1999) and *Sanville*, 266 F.3d at 733).

Garner is convinced that the only effective way to treat his lactose intolerance was to provide him with lactose-free meals or perhaps pills (such as Lactaid) to counter the effects of lactose. However, Garner has not produced any evidence, such as expert testimony, that suggests that Dr. Sumnicht's treatment decision to have Garner self-select away from dairy was a substantial departure from accepted professional judgment, practice or standards. Without such a showing, Garner can not show that Sumnicht acted with deliberate indifference.

Dr. Sumnicht did not ignore Garner's complaints, and he took reasonable measures to ensure that his treatment plan was effective. Throughout the relevant time period, Dr. Sumnicht and other HSU staff regularly monitored Garner's condition and prescribed him various medications to alleviate his symptoms, including Lactaid, Vitamin D supplements, Omeprazole, Metamucil, Loperamide and Reguloid. Garner complains that he was taken off several of these medications at one point or another, but as with many of his complaints, he has no medical evidence or expert opinion to contradict Dr. Sumnicht's professional judgment in this matter.

Garner claims that Dr. Sumnicht told him that his Vitamin D level was low because Garner was not getting a sufficient amount of dairy in his diet. Although I accept this allegation

as true for purposes of summary judgment because it was not properly disputed, Garner has failed to show that Dr. Sumnicht acted with deliberate indifference to Garner's Vitamin D deficiency.  The record shows that Dr. Sumnicht tested Garner's Vitamin D level on several occasions and successfully treated him with supplements in a timely fashion.  In August 2008, Garner's Vitamin D level was less than 7.0 (normal is 32 to 100); however, by October 2008, it had increased to 22.6 and on September 2, 2010, it was in the normal range at 35.  There is no evidence that Garner had a continued Vitamin D deficiency that went untreated.  Although Garner avers that he had a "diagnosed" Vitamin D deficiency in July 2012, the medical record that he cites as support does not indicate that it was a current condition.  *See Payne v. Pauley*, 337 F.3d 767, 773-74 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) (Although party's affidavit can constitute affirmative evidence to defeat summary judgment, conclusory allegations, unsupported by specific facts, will not suffice).  The record entitled "Problem List" contains an entry dated "7-12" that reads: "Vit D deficient <7.0 8-7-08," dkt. 39, Exh. D.  This entry appears to be a note of Garner's *past* Vitamin D deficiency from August 2008.  In any event, Garner proposes no facts indicating how long the alleged condition lasted in July 2012 or whether defendants took any action to address it.

Garner also has not produced sufficient evidence that he remained at an unhealthy weight during the relevant period.  Garner alleges that his weight has fluctuated between 120 and 140 pounds and that he went from 141 pounds in May 2010 to 135 pounds in July 2010.[15] Although 120 pounds is below what is considered malnourishment for a person of Garner's height, Garner has not indicated when he weighed 120 pounds or for how long.  Garner's loss of six pounds in 2010 also is not significant given that the weight loss occurred over two months

---

[15] Garner's exact weight during the years in question is either disputed or not in the record before the court.

and placed him at 135 pounds, which is close to his normal range according to the BMI calculator used by the Centers for Disease Control.  (Notably, Garner weighed only three pounds more, or 138 pounds, at the time of his intake at WCI.)  By 2013, Garner weighed 156 pounds.

Garner explains that his weight was higher in 2013 because he was able to purchase supplemental food from the canteen when he was in general population; when he was in segregation, he was not allowed to order from the canteen.  As defendants correctly point out, however, Garner had a choice whether he would be housed in segregation or  remain in a regular housing unit, presumably by avoiding behaviors that will result in him being sent to segregation. Therefore, Garner was not completely at the mercy of food choices made by the institution.  Further, Garner cannot refute Dr. Sumnicht's opinion that many of the foods that Garner ordered from the canteen when he was housed in general population would have aggravated Garner's digestive system.  Some foods ordered by Garner would appear, by description, to contain dairy: "nacho cheese tortilla chips," "nacho cheese dip," "Velveeta spicy cheesy rice," "cheddar cheese popcorn," "jalapeno and cheddar chips," "cheddar & sour cream potato chips," "habañero cheese spread."  Without intending to play armchair nutritionist, other foods ordered and consumed by Garner would appear, by title, to have the potential to cause indigestion in just about any adult GI tract: "hot porkies," "hot & spicy ramen noodles," "hot sauce," "Atomic Fireballs candy," "hot chili," "hot chili with beans," "fish steaks in hot sauce," "garlic kosher pickles," "Cajun shrimp," "hot peanuts," and "chili ramen noodles."

Garner argues that it is unreasonable for defendants to deny him a special diet tray because even the prison's current diet order form includes an "other" category that would allow for a special diet.  This misses the point: Garner has failed to refute Dr. Sumnicht's professional judgment that a special diet is not medically necessary for Garner and that the best course of treatment for his condition is food self-selection from regular diet trays.

Finally, Garner suggests that Dr. Sumnicht ignored his IBS.  However, Garner says very little about it, only briefly asserting that "proper channels" were not taken to diagnose or treat

him.  Dkt. 37 at 7.  Although there is some indication in the record that some HSU staff suspected or suggested that Garner had IBS, Schrubbe told Garner on February 23, 2011 that according to his medical chart, Garner did not have a definitive diagnosis.  Schrubbe reiterated this fact in her November 2012 reports to the ICEs who investigated Garner's complaints that his IBS was going undiagnosed and untreated.  On December 15, 2012, Garner asked Schrubbe to send him to a specialist to test him for IBS.  However, according to the response that he received from Schrubbe, the medical staff opined that a test for IBS was not medically necessary.  Further, as discussed above, Dr. Sumnicht prescribed various medications over the years to address Garner's abdominal symptoms.

In sum, there is no evidence that Dr. Sumnicht ignored Garner's complaints of IBS-like symptoms.  Garner instead takes issue with the fact that Dr. Sumnicht made the decision that tests and medication were not required in Garner's case.  Garner has not come forth with any evidence or expert opinion to contradict Dr. Sumnicht's medical conclusion.  At most, such conduct amounts to negligence and not to "something approaching a total unconcern for [Garner's] welfare in the face of serious risks, or a conscious, culpable refusal to prevent harm[.]"  *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir. 1992).

Summary judgment is "put up or shut up time" when a party must show what evidence he has that would convince a trier of fact to accept his version of events.  *On-Site Screening, Inc. v. United States*, 687 F.3d 896, 899 (7th Cir. 2012).  Because Garner has failed to meet his burden of coming forth with sufficient evidence to establish that Dr. Sumnicht acted with deliberate indifference to Garner's lactose intolerance and IBS, Dr. Sumnicht is entitled to summary judgment.

### B.  Defendant Gorske

Defendant Gorske treated Garner on several occasions but it is unclear what Garner believes that she personally did anything wrong that was independent and distinct from following Dr. Sumnicht's orders.  It is undisputed that Gorske never had the authority to override or alter orders issued by other health care professionals, nor did she ever have the ability to write prescriptions or refer inmates to outside specialists.  She either repeated the instructions that Dr. Sumnicht had given or scheduled Garner for an appointment with HSU.  *See Burks v. Raemisch*, 555 F.3d 592, 593-94 (7th Cir. 2009) (liability depends on defendant's own individual actions and not those of others).

In his brief, Garner takes issue with the fact that Gorske told him on September 14, 2009 that he did not have lactose intolerance and did not need a special diet because he could cut his dairy portions in half.  However, Gorske did not ignore Garner's requests for assistance; she merely followed a treatment regimen outlined by Dr. Sumnicht.  Gorske cannot be held liable for relying on Dr. Sumnicht's medical judgment, particularly where it has not been shown that his judgment substantially departed from accepted standards.  *See id.* at 595 ("no prisoner is entitled to insist that one employee do another's job").  Further, even assuming that Gorske somehow failed to respond appropriately to Garner's complaints on September 14, 2009, that isolated incident would not amount to more than negligence on Gorske's part. *See Gutierrez*, 111 F.3d at 1375 (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992)) ("A finding that a defendant's neglect of a prisoner's condition was an 'isolated occurrence,' . . . or an 'isolated exception' . . . to the defendant's overall treatment of the prisoner ordinarily militates against a finding of deliberate indifference.").

Without any further evidence that Gorske ever was in a position to be personally responsible for Garner's medical care, or actually reached her own independent medical

24

conclusion with respect to Garner's condition, she cannot be held liable for failing to treat him. Accordingly, Gorske is entitled to summary judgment.

### B. Defendants Thorpe and Schrubbe

As alluded to above, liability under § 1983 must be based on a defendant's personal involvement in the constitutional violation. *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). It is undisputed that defendants Schrubbe and Thorpe never personally treated Garner, had no personal involvement in any decisions regarding his medical treatment, did not have the authority to override or alter orders issued by other health care professionals and lacked the ability to write prescriptions or refer inmates to outside specialists. As a result, they can not be held liable under § 1983 for Garner's care and treatment.

#### 1. Thorpe

Garner argues that Thorpe knew about his condition from his inmate complaints and a letter he wrote to her in February 2010 but that she "turned a blind eye" and allowed Dr. Sumnicht and Gorske to deny him a lactose-free diet. In this case, Thorpe acted only as a reviewing authority with respect to Garner's inmate complaints, reviewing the complaint examiners' recommendations. Although Garner asserts that Thorpe could have reversed the dismissals of his complaints, inmate complaint examiners are "entitled to relegate to the prison's medical staff the provision of good medical care." *Burks*, 555 F.3d at 595. Accepting a recommendation to dismiss Garner's complaints does not manifest deliberate indifference to his underlying medical problems. *Id.* (finding similar). "Public officials do not have a free-floating obligation to put things to rights." *Id.* at 595.

Unless Thorpe somehow refused to do her job as a reviewing authority or left Garner to "face risks that could be averted by faithful implementation of the grievance machinery," she cannot be held liable or his alleged inadequate medical care. *Id.* Because nothing in either the undisputed facts or Garner's allegations indicates that Thorpe failed in her duties as a reviewing authority, she is entitled to summary judgment.

### 2. Schrubbe

Schrubbe's responsibility as the HSU Manager was overseeing the delivery of medical services and providing administrative support. Although Garner wrote to Schrubbe with numerous complaints and questions about his medical care and believes that she should have made sure he received better care for his lactose intolerance and IBS, she had no such responsibility. Section 1983 does not establish system of vicarious liability for supervisors; liability depends on the individual defendant's actions and not the person they supervise. *Burks*, 555 F.3d at 593-94.

The record shows that Schrubbe responded to each of Garner's requests by referring to his medical record and the decisions of his health care providers or by scheduling an appointment for him to see HSU staff. Schrubbe had no authority to order Garner a special diet, refer him to a specialist for his IBS or make any other treatment decision without Sumnicht's say so.

Garner suggests that Schrubbe failed to follow through on his March 16, 2013 request for medication and to be fed in his cell. He claims that although Schrubbe told him he was scheduled to see a nurse, he never saw one for these complaints. Garner did see a nurse on March 19, 2013,however, and could have raised his concerns at that point. Further, even assuming that Schrubbe was somehow to blame for Garner's failure to see a nurse about

26

medication and being fed in his cell, this isolated incident amounts to no more than simple negligence.

Garner also seems to take issue with the fact that Schrubbe denied his March 22, 2010 request to be allowed to purchase food from the canteen because he was in segregation.  There is no indication in the record, however, that Schrubbe had any authority to grant such permission.  Although Garner implies in his brief that Schrubbe was ignoring orders from Dr. Sumnicht that Garner be provided with mackerel or MVI to meet his dietary needs (for example, he cites various cases indicating that it is deliberate indifference to ignore a physician's orders), there is no evidence that Dr. Sumnicht made such an order.  The record that Garner cites in support of his allegation indicates only that Sumnicht had written in a progress note that mackerel and MVI were "on canteen," not that Garner be allowed to order those items even though he was in segregation.  Schrubbe noted this fact in response to the ICE's investigation of Garner's April 2, 2010 inmate complaint about not being allowed to purchase items from the canteen.

Because there is no basis for holding Schrubbe liable under § 1983 for deliberate indifference to Garner's medical needs, she is entitled to summary judgment.

## III.  State Law Claims

When all the federal claims in a case have been dismissed, the general rule is that a district court should decline to exercise jurisdiction over any remaining state law claims under 28 U.S.C. § 1367(c)(3).  *Cadleway Properties, Inc. v. Ossian State Bank*, 478 F.3d 767 (7th Cir. 2007); *Redwood v. Dobson*, 476 F.3d 462, 467 (7th Cir. 2007).  In this case, the parties do not identify any reason for retaining jurisdiction over the state law claims.  In fact, apart from a brief statement from defendants, neither side has argued the merits or lack of merits of the state law

claims or even their scope.  It would not be a wise use of judicial resources to resolve claims of unclear scope without developed arguments from the parties.  Accordingly, I will dismiss the state law negligence claims without prejudice to Garner's refiling them in state court.

## ORDER

IT IS ORDERED that:

(1)    The motion for summary judgment filed by defendants Paul Sumnicht, Belinda Schrubbe, Cynthia Thorpe and Mary Gorske (dkt. 42) is GRANTED.

(2)    The motion for summary judgment filed by plaintiff Oscar Garner (dkt. 36) is DENIED.

(3)    The court declines to exercise supplemental jurisdiction over plaintiff's state law claims.  Those claims are DISMISSED WITHOUT PREJUDICE to plaintiff's refiling them in state court.

(3)    Plaintiff's motion for assistance in recruiting counsel (dkt. 61) is DENIED.

(4)    The clerk of court is directed to enter judgment in favor of defendants and close this case.

Entered this 6th day of September, 2013.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge